**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MELISSA McCAFFREY, on behalf of herself and all others similarly situated<br><br>    Plaintiff,<br><br>  v.<br><br>MAIBEC INCORPORATED,<br><br>    Defendant. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT AND JURY DEMAND** |

Plaintiff, Melissa McCaffrey, by and through her undersigned attorneys, makes the following allegations and claims for her Class Action Complaint against Defendant, Maibec Incorporated ("Maibec", "Defendant" or the "Company"). Unless otherwise noted, the following allegations are made upon information and belief, except as to allegations specifically pertaining to Plaintiff, and Witnesses James Vander Veer, David Bashaw, and Falcone Contracting Corporation, which are made upon their personal knowledge:

## NATURE OF THE CASE

1. This is a putative class action brought by Plaintiff Melissa McCaffrey, a purchaser of Maibec shingles. Plaintiff brings this action on behalf of a class of all similarly situated property owners, against Maibec, the manufacturer of certain wood shingles (the "Shingles") made from the Eastern White Cedar tree.

2. Maibec Shingles have, at least until recently, generally been considered to be very high quality. The Shingles are made of natural wood that, according to the Company, is treated for endurance. Maibec wood Shingles are purportedly of such high quality, in fact, that the Company purports to guarantee the Shingles for 50 years.

1

3.     Contrary to Maibec's representations and its illusory warranty, its Shingles are plagued by design flaws that result in decay, including warping, peeling, cracking, buckling and curling.   Yet Maibec continues to sell them to the public and continues to make false representations and warranties, despite the fact that the Shingles deteriorate well before the warranty expires, are defective, have failed and will continue to deteriorate, causing property damage, and costing consumers substantial removal and replacement costs.

4.     This class action seeks damages, punitive damages, injunctive relief, costs, attorneys' fees, and other relief as a result of Maibec's willful, wanton, reckless, and/or grossly negligent acts or omissions in causing consumers' homes to be in a dangerous, defective, unsafe, and unfit condition for habitation.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2)(A) because Plaintiff and Defendant are of diverse citizenship and the matter in controversy exceeds seventy-five thousand dollars ($75,000.00) exclusive of interest and costs; and pursuant to 28 U.S.C. § 1332(d)(2), because Plaintiff and substantially all Class Members are citizens of a State and Defendant is a citizen of a foreign state; and the aggregate amount in controversy exceeds five million dollars ($5,000,000.00) exclusive of interest and costs, and there are 100 or more members of the proposed Class.

6.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to this claim occurred in this district, Plaintiff resides in this district, and Defendant is subject to personal jurisdiction in this District.

7.     As a result of Defendant's designing, testing, developing, manufacturing, marketing, distributing, promoting and/or selling, either directly or indirectly through third

parties or related entities, of Shingles to purchasers throughout New York, Defendant obtained the benefits of the laws of New York and profited from New York commerce.

8.     Defendant conducted systematic and continuous business activities in and throughout the State of New York and otherwise intentionally availed itself of the markets of the State of New York through the promotion and marketing of its business.

## PARTIES

9.     Plaintiff Melissa McCaffrey is a citizen of New York, residing at 9 Seaview Street, Massapequa, New York 11758.   Plaintiff purchased Maibec shingles, which were installed in May 2007 and currently remain installed on her home.

10.     Defendant Maibec is a Canadian corporation with its principal place of business at 250 - 1990 - 5th Street, Saint-Romuald, Quebec G6W 5M6, Canada.   Maibec is authorized to transact business in the State of New York, and is currently doing so.   According to its website, Maibec, through its agents and distributors, advertises, markets and sells shingles, at a minimum, in the following states:   Connecticut, Massachusetts, Maine, New Hampshire, New York, New Jersey, Rhode Island, North Carolina, South Carolina, Tennessee, Virginia, Pennsylvania, Delaware, Maryland, District of Columbia, West Virginia, Washington, and Oregon.   At all times relevant hereto, Maibec was engaged in the design, manufacture, marketing, and sale of shingles that have been installed in numerous homes, offices, buildings, and other structures throughout the United States, including in New York.

## FACTUAL ALLEGATIONS

### About Maibec

11.     Maibec is a leading manufacturer of cedar shingles in North America and Canada's leading manufacturer of wood siding.

3

12.     Maibec is, and at all times relevant hereto, engaged in the business of designing, developing, manufacturing, distributing, marketing, selling, and installing a variety of Shingles, including but not limited to:

- Nantucket (Allegedly Grade A, with no imperfections)

- Kennebunk (Allegedly Grade B Clear, with no imperfections on exposed face)

- Bar Harbor (Allegedly Grade C 2nd Clear, with Sound knots on exposed face, Contrasting tones)

**Maibec's False and Misleading Marketing of its Shingles and Illusory Warranties**

13.     Maibec advertised that the Shingles were safe, reliable and worry-free despite failing to adequately test and determine the reliability of its product when used in the real world.

14.     Maibec represented on its website, regarding various makes of Shingles:

Eastern white cedar is very durable and requires very little maintenance. It contains natural preservatives which protect it from rot and insects.

\* \* \* \*

Nothing compares to [m]aibec cedar shingles.

15.     Defendant further represents on its website that:

When it comes to siding a house, nothing compares to eastern white cedar. It is warm, beautiful, and has proven reliable for over a century. At Maibec, we have spent the last four decades improving the way white cedar shingles are made. Today, they are engineered to be so durable, you just might consider them high tech.

\* \* \* \*

Now the look and feel that everyone else has spent years trying to imitate is even harder to beat.

4

16.     Most importantly, Maibec misrepresents that its Shingles will last for 50 years, and purportedly warrants its Shingles for 50 years against wood decay.  Defendant represents that:

> Best of all, Maibec shingles are guaranteed to last. Our original 50-year warranty against wood decay, up to 30 years* warranty on two coats of solid stain and 5-year warranty on labour is one of the best warranties in the industry.

17.     Maibec's representations lead reasonable consumers to believe that its Shingles are a premier product and Maibec charged those consumers a premium price for that product.

18.     The purpose of its 50-year warranty against wood decay can only be to persuade consumers that Maibec Shingles are long lasting so that they will have continued curb appeal, and are functional with the ability to act as a weather barrier.

19.     The 50-year warranty induces customers into purchasing Maibec Shingles and provides a false belief that the Shingles are long-lasting and that Maibec stands behind its representations and will honor its warranty.

20.     However, Plaintiff's investigation (through counsel) has revealed that the grain orientation in Maibec's Shingles (including the Shingles installed on Plaintiff's home) is such that the grains run generally perpendicular to the edge of the shingles (known as a "flat" orientation), consistent with the orientation of the lowest quality shingles on the market.  By contrast, in higher quality shingles, the closely spaced grains run generally parallel (or "vertical") to the edge of the shingles.

21.     Differences in grain orientation have a significant impact on the resilience, dimensional stability and functionality of shingles. In the course of her investigation, Plaintiff (through counsel) has consulted with an industry professional who has inspected Plaintiff's

Shingles and confirmed the importance of grain orientation on the life and performance of shingles such as those installed on her home.

22.     Indeed, the impact of grain orientation on shingle life and performance is well known in the construction industry.

23.     As a July/August 1997 article in *Old-House Journal*, a trade publication, explains, "grain orientation in shingles has a big influence on life and performance. [the] [v]ertical-grain … cut limits expansion and shrinkage of the shingle's width, reducing the chances for open joints, and weathers evenly, extending the life of the shingle. Flat-grain … looks semicircular.  It tends to cup and wear unevenly."

24.     The grain orientation of Maibec Shingles establishes that the Shingles are an inferior product and that Maibec's representations about the quality and durability of its product are false and materially misleading.  It is inconceivable that Maibec, a premier Canadian and leading North American manufacturer of shingles, would not have known that the grain orientation of its Shingles made those Shingles susceptible to failure far sooner than 50 years Maibec represented in its warranty.

25.     Despite its knowledge of the defects which cause the Shingles to deteriorate, Maibec continues to market its Shingles as a top of the line product in an attempt to mask their inferiority.

26.     Maibec's representations were false and misleading because:  (1) Maibec knows that its Shingles are defective, will fail in a fraction of that time, and are not fit for their intended purpose; and (2) Maibec consistently fails to honor its warranty obligations.

27.     Defendant knowingly and intentionally concealed and failed to disclose that -- notwithstanding statements on its website, brochures, advertisements and warranties-- its

Shingles routinely warp, peel, crack, buckle and curl far in advance of the expiration of the warranty period. Indeed, Defendant's Shingles have deteriorated and will continue to deteriorate at a rate that demonstrates their lack of durability and resiliency.

28.     Similarly, Defendant knowingly and intentionally concealed and failed to disclose that it actually had no intention of providing the services set forth in its warranties and that it routinely fails to honor its warranty when consumers notify Maibec of the deterioration of the Shingles.

29.     Defendant also made numerous material omissions in its literature and uniformly withheld important information relating to the design, reliability and performance of the Shingles.

30.     Purchasers of Defendant's Shingles make purchasing decisions based in part and in reliance upon the information presented by the Company on its website, marketing literature, advertisements and warranties.

31.     Defendant has had notice of the deficiencies described herein and has been routinely notified by its customers that the Shingles were defective and not functioning as advertised.

32.     Defendant and its authorized agents and distributors made each of the above described assertions, statements, representations and warranties with the intent and purpose of inducing suppliers, builders, and consumers to purchase and install the Shingles in residential and commercial structures in the State of New Jersey and elsewhere. However, Defendant knew that these misrepresentations were not true and that the Shingles were defective and would not function as promised.

7

33.     Had Defendant not withheld and omitted important information about the design, reliability and performance of the Shingles, Plaintiff and the members of the Class would not have purchased and/or installed them, or would not have purchased the Shingles at the prices that they in fact paid.

**Internet Complaints About Maibec Shingles**

34.     Numerous Maibec customers have complained about the premature failure of their Shingles.   The following represents a small sampling of Internet postings by Maibec product purchasers' reflecting their frustrations with the defective Shingles:

*

Maibec used to be the standard in New England, but they have gone way down in quality over the last few years. I bought 45 sq when I built my house a couple of years ago and sent them back. Even the lumberyard told Maibec that they were garbage. Allegedly (as told to me by my rep who talked to Maibec), they have been cutting quality to compete with less expensive competitors. After my experience, I would never use them again, nor would I recommend them to anyone except someone I dislike.

[Posted on http://forums.jlconline.com/forums/archive/index.php/t-38701.html by "Linneus" on 02-05-2009 at 12:19 PM]

*

We installed Maibec Nantucket shingles pre-finished with Cabot stain. They are moving whenever exposed to direct sunlight. The rep's are telling me that the movement we are experiencing is acceptable and is to be expected. I find it hard to believe that could be true and this to be normal.... The owner of the home is insisting there is something wrong with the shingles, and I resolve this situation (replace all shingles with something else) before they will pay me. Maibec has walked away from me, with no resolution. Cabot Stain seems to be on the side of Maibec and aren't willing to commit to anything or analyze the samples as promised before they knew it was a Maibec shingle..... I desperately need help..... I need an unbiased expert evaluation of the product and the installation to see if the product is defective or if there is some other underlying problem....

do you know of anyone with no ties to Maibec, Cabots, or Capital forest products that I could hire to evaluate this issue.... someone *who's* expertise

8

is relative to white cedar. Or a place that could analyze shingle/stain samples.

Any information would be Greatly Appreciated. Thank You again for your time.

[Posted on http://forums.jlconline.com/forums/archive/index.php/t-38701.html by "Steve" (using user name "falconecorp") on 08-27-2007 at 10:22 PM; Falcone Contracting Corp. is located in Glen Head, N.Y. and further identified below]

*

Maibec has lowered its grading, IMO (and others). They are using narrower shingles and are allowing for more and much larger knots. Of the several square that I did install, I noticed that they did curl/ warp much more than what I used to finish the job. I ended up finding a local guy who saws a beautiful shingle (in no small part because the local yards only sold Maibecs at the time), against which the Maibecs could not compare.

[Posted on http://forums.jlconline.com/forums/archive/index.php/t-38701.html by "Linneus" on 02-06-2009 at 07:35 PM]

*

I am a homeowner, and have had 2 homes built in the last 4 years. Both times I used the Maibec prestained shingles (light beige), not sure of the name.

On both houses, in short time, I have had the same problems you are experiencing. Cupping, moving, curling, etc. They looked 20 years old.

I never tried to resolve the problem, figuring the shingles just stink. Burn me twice shame on me. On my next house, I am going to stain them in place with a spray.

Just wanted to you know that its not just you.

[Posted on http://forums.jlconline.com/forums/archive/index.php/t-38701.html by "zippydmm" on 12-19-2007 at 07:10 PM]

*

Shingles are cupping, curling and pulling away from sidewall on all sides of the house… The house seems to "come alive" when in direct sunlight… All installation guidelines have been met or exceeded.  The reps have not concluded the problem and are dodging the issue.

[Posted on http://www.contraactortalk.com/f4/maibec-shingles-24142-print/ by "Steve" (using user name "falconecorp") on 07-06-2007 at 08:48 PM]

**Plaintiff Melissa McCaffrey**

35.     Plaintiff Melissa McCaffrey is the owner of a home located at 9 Seaview St., Massapequa, NY. In May 2007, Plaintiff purchased Maibec shingles which were installed by Building Dreams Construction, Inc.

36.     Plaintiff's shingles are defectively designed and manufactured and prematurely failed prior to the expiration of their warranted life.

37.     Upon discovering this failure, Plaintiff contacted Defendant and submitted a warranty claim. To date, Defendant has failed to honor its warranty and has failed and refused to take responsibility for its Shingles.

38.     Upon discovering this failure, Plaintiff learned of other class members experiencing the same problems with Defendant's Shingles and that Defendant is refusing to honor its warranty obligations despite its knowledge that the Shingles are defective.

39.     Like Plaintiff, other members of the Class also purchased defective Shingles and warranties from Defendant who, upon information and belief, did not repair or replace the Shingles in accordance with the terms of its warranties to those purchasers.

40.     Plaintiff and members of the Class have suffered damages as a result of Defendant's deceptive practices, including but not limited to the fact that their Shingles quickly deteriorate, are defective and require replacement (which has caused, or will cause, them to incur material and labor costs) earlier than could have reasonably been expected. Additionally, as a result of the defective quality of Defendant's Shingles, Plaintiff, and members of the Class have suffered damage to the underlying structures of the homes where Defendant's defective Shingles

were installed, and the values of the affected homes have been diminished. While these customers are forced to repair and/or replace Defendant's defective Shingles, they are not reimbursed for the costs associated with this expense, in contravention of the terms of Defendant's warranties.

### The Experiences of Other Maibec Customers Confirm Maibec's Knowledge

#### Witness David Bashaw

41.     Witness David Bashaw is a property manager of various condominium complexes and single family homes in North Kingstown, Rhode Island.

42.     In 2008, Bashaw hired a reputable wood siding contractor to install Maibec Shingles on certain properties within a condominium complex (the "2008 Project").

43.     Within a few months of the Shingle installation, Bashaw noticed that the Maibec Shingles were curling, buckling, warping and cupping in certain areas of the 2008 Project.

44.     Bashaw, as well as the siding contractor, repeatedly contacted Maibec regarding the deformed Shingles on the 2008 Project.

45.     On at least one occasion, Keith Ball, a representative of Maibec, performed a site visit and witnessed the deformed Shingles, but Maibec refused to honor its warranty despite the deteriorating condition of the Shingles.

46.     Since Maibec would not honor its warranty, Bashaw's siding contractor purchased additional Maibec Shingles to replace the Shingles in the areas that displayed the worst deterioration.

47.     Within months of the repair, the Shingle replacements were cupping, curling, warping, and buckling.

48.     Bashaw chose Maibec Shingles because he wanted the "Cadillac" of shingles and relied upon Maibec's representations of superior quality and warranties in choosing Maibec over its competitors.

49.     Bashaw has since switched to one of Maibec's competitors for other siding projects due to his negative experience with Maibec Shingles and has not experienced any of the same cupping, curling, warping, and buckling still present today on the 2008 Project.

50.     The installation of shingles on the 2008 Project and the subsequent projects Bashaw has completed using competitor shingles does not vary.

**Witness James Vander Veer**

51.     Witness James Vander Veer was formerly the owner of Artisan, a home improvement company, which is now defunct.  In 2003, Greg and Michelle Barry (the "Barrys") hired Artisan to perform certain work on their home located at 7 Haggars Lane, Fair Haven, New Jersey, including the installation of siding.

52.     Artisan subcontracted the siding job to a reputable wood siding contractor, who had installed Maibec siding on hundreds of homes since 1999.

53.     The siding was installed in or about November 2003 using Maibec Shingles.

54.     In late 2007, the Barrys telephoned Mr. Vander Veer complaining that the Maibec Shingles located on the south and west side of the house (the part of the house that was exposed to the most direct sunlight) were curling and lifting away from the house.

55.     Upon discovering this failure, the Barrys and Mr. Vander Veer repeatedly contacted Defendant and demanded that it stand by its warranty.  Defendant refused.

56.     As a result of the deterioration of the Maibec Shingles, the Barrys, in 2009 instituted suit against Artisan and others in the Superior Court of New Jersey, Law Division,

Monmouth County, Docket No. L-5842-09.   Maibec was joined and became a party to that action.

57.     In or about October 2010, the parties in the state court action entered into a settlement and the state court action was subsequently dismissed.

**Witness Falcone Contracting Corp.**

58.     Witness Falcone Contracting Corp. ("Falcone" or "Falcone Corp.") is a general contracting company located in Glen Head, New York.

59.     Sometime in 2007, Falcone purchased Maibec Shingles for a renovation project in Long Island, New York (the "2007 Project").

60.     Falcone chose Maibec Shingles over the products of its competitors because Maibec advertised that Maibec's pre-stained shingles were the best in the industry, long-lasting, durable and were warrantied for 50 years.

61.     Within days of installing Maibec Shingles on one side of the 2007 Project that was subject to direct sunlight, Falcone's installer noticed that the Shingles had come "alive" and were warping to such an extent that exposed the underside of the Shingles.

62.      Falcone immediately contacted Maibec regarding the Shingles' defect and a Maibec representative, Keith Ball (the same representative who Mr. Bashaw's 2008 Project), visited the 2007 Project site to inspect the Shingles.

63.     Upon the initial inspection, Mr. Ball informed Falcone that the Shingles simply needed time to "settle" and would "lay flat" with time.

64.     By the time Falcone completed the 2007 Project with the Maibec Shingles, the defective Shingles had not settled and continued to deteriorate.

65.     Mr. Ball visited the 2007 Project site an additional three times to inspect the defective Shingles.

66.     During his last inspection, Mr. Ball could not provide a reason as to why the Shingles continued to warp and had not settled down as previously advised by Maibec.  Mr. Ball also noted that the Shingles were properly installed, but he could not provide a suggestion for curing the Shingles' defect short of replacing the Shingles.

67.     Maibec subsequently provided Falcone additional Shingles to replace the Shingles that were continuing to deteriorate.  Maibec refused to reimburse or pay for the labor required to uninstall and reinstall the Shingles.

68.     Falcone used Maibec's replacement Shingles to replace those Shingles that were in the worst condition.  These replacement shingles also deteriorated shortly thereafter.

69.     In 2011, many of the replacement Shingles decayed to such an extent that they cracked and ultimately fell from the home.

70.     Falcone purchased additional Maibec Shingles to replace the replacement Shingles a second time.  However, these Shingles have also warped, cupped and are decaying in the same manner as the original and first replacement Shingles.

71.     The experiences of Witnesses Bashaw, Vander Veer and Falcone Corp., show that Maibec was well-aware of customer complaints and experiences concerning the defects in its Shingles.  Despite this knowledge, Defendant has failed to implement any changes to its Shingles or warranty procedures sufficient to remedy the defects associated with the products.

## CLASS ACTION ALLEGATIONS

72.     Plaintiff seeks to bring this case as a class action, under Federal Rule of Civil

Procedure 23, on behalf of herself and all others similarly situated.  The proposed Class ("the

Class") is defined as:

> **All individuals and entities that have owned, own, or acquired homes, residences, buildings or other structures physically located in the United States, on which Maibec Incorporated shingles are or have been installed since 1986.  Maibec Incorporated shingles are defined to include without limitation all shingles manufactured or distributed by Defendant and include, without limitation, the following brand names: Nantucket, Kennebunk and Bar Harbor. Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest or which has a controlling interest in Defendant, and Defendant's legal representatives, assigns and successors.  Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.**

73.     In the alternative, Plaintiff Melissa McCaffrey brings this case as a class action,

under Federal Rule of Civil Procedure 23, on behalf of herself and all others similarly situated in

New York as members of a proposed class (the "New York Subclass"), defined as follows:

> **All individuals and entities that have owned, own, or acquired homes, residences, buildings or other structures physically located in New York, on which Maibec Incorporated shingles are or have been installed since 1986.  Maibec Incorporated shingles are defined to include without limitation all shingles manufactured or distributed by Defendant and include, without limitation, the following brand names:  Nantucket, Kennebunk and Bar Harbor.  Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest or which has a controlling interest of Defendant, and Defendant's legal representatives, assigns and successors.  Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.**

74.     Plaintiff reserves the right to re-define these Classes prior to class certification.

75.    The number of persons who are members of the Class (or Subclasses), as described above, is so numerous that joinder of all members in one action is impracticable.

76.    Questions of law and fact that are common to the entire Class (or Subclasses), predominate over individual questions because the actions of Defendant complained of herein were generally applicable to the entire Class (or Subclasses).  These legal and factual questions include, but are not limited to:

a)  whether the Shingles are defective;

b)  whether Defendant knew or should have known of the defective nature of the Shingles;

c)  whether Defendant owed a duty to Plaintiff and the Class to exercise reasonable care in the design, manufacture and marketing of the Shingles;

d)  whether Defendant breached this duty;

e)  whether the Shingles failed to perform in accordance with the reasonable expectations of ordinary consumers;

f)  whether the Shingles failed to perform for the time warranted by Defendant;

g)  whether the warranties are unconscionable and unenforceable;

h)  whether Defendant knew and failed to disclose that it did not intend to honor its warranties and in fact, routinely refuses to honor its warranties; and

i)  whether Plaintiff and the Class suffered damages as a result of Defendant's conduct.

77.    All questions as to the representations and publicly disseminated advertisements and statements attributable to Defendant at issue herein are similarly common.  A determination of Defendant's knowledge regarding the misleading and deceptive nature of the statements made in its website, brochures, advertisements and warranties and its breaches of contract will be

applicable to all members of the Class (or Subclass, as defined above).   Further, whether Defendant violated any applicable state laws and pursued the course of conduct complained of herein, whether Defendant acted intentionally or recklessly in engaging in the conduct described herein, and the extent of the appropriate measure of injunctive and declaratory relief, damages and restitutionary relief are common questions to the Class (or Subclass, as defined above).

78.   Plaintiff's claims are typical of the members of the Class.   Plaintiff Melissa McCaffrey purchased defective Shingles.   The Shingles malfunctioned before the expiration of the applicable warranty period.   Plaintiff, like all members of the Class, has suffered damages associated with the use of Defendant's defective products, including not only the premature failure of the products themselves, but also damage to the underlying structure caused by moisture intrusion and exposure of the area underlying the Shingles to the elements such as wind, rain and UV rays.

79.   Plaintiff will fully and adequately represent and protect the interests of the Class (or Subclass, as defined above) because of the common injuries and interests of the members of the Class (or Subclass) and the singular conduct of Defendant that is or was applicable to all members of the Class (or Subclass).   Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation.   Plaintiff has no interests that are contrary to or in conflict with those of the Class (or Subclass) she seeks to represent.

80.   A class action is superior to all other available methods for fair and efficient adjudication of this controversy.   Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

81.   The prosecution of separate actions by individual members of the Class (or Subclass) would create a risk of inconsistent and varying adjudications concerning the subject of

this action, which adjudications could establish incompatible standards of conduct for Defendant under the laws alleged herein.

82.     The claims of the Class (or Subclass) may be certified under Rule 23(b)(1), (b)(2) and/or (b)(3).  The members of the Class (or Subclass) also seek declaratory and injunctive relief but also seek sizeable monetary relief.

## ESTOPPEL FROM PLEADING AND TOLLING OF
## APPLICABLE STATUTES OF LIMITATION

83.     The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through failing to disclose a known defect to Plaintiff and the members of the Class (or Subclass), and misrepresenting the nature of their product as safe for its intended use, actively concealed from Plaintiff and the members of the Class, the true risks associated with its Shingles.

84.     Because the defects in the Shingles are latent and not detectable until manifestation, Plaintiff and the members of the Class (or Subclass) were not reasonably able to discover that their Shingles were defective until after installation, despite their exercise of due diligence.

85.     Defendant knew that the Shingles were defective prior to the time of sale, and concealed that material information from Plaintiff and all consumers.

86.     As such, any applicable statutes of limitation have been tolled by Defendant's concealment of material facts and Defendant is estopped from relying on any such statutes of limitation.

# FIRST CLAIM FOR RELIEF
## (Breach of Contract)

87.     Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

88.     During the Class Period, Plaintiff Melissa McCaffrey and Class members, upon purchasing Defendant's Shingles, entered into a contract and warranty agreement with Defendant.

89.     Defendant uniformly breached its contract and warranty agreement with Plaintiff and the members of the Class by failing to perform according to its obligations under the applicable law and the agreements.

90.     Defendant's contract and warranty agreements were subject to the implied covenants that Defendant would conduct its business with Plaintiff and the members of the Class in good faith and would deal fairly with its consumers.

91.     Defendant breached their contract and warranty agreement with Plaintiff and the members of the Class by violating the implied covenant of good faith and fair dealing inherent in agreements.  Defendant breached the covenant by selling Plaintiff and Class members Shingles that were inherently defective in bad faith with knowledge that the contract and/or warranties were unconscionable, that its warranties would not be honored, and by abusing its discretion in its performance of the contract by intentionally subjecting Plaintiff and the members of the Class to a risk, to wit, the defect inherent in the Shingles, beyond what Plaintiff and the members of the Class could have contemplated at the time of purchasing the Shingles.

92.     Further, Defendant breached the implied covenant by not providing terms in the contract and/or warranty that conspicuously stated to Plaintiff and Class members that the Shingles would develop the defect.

19

93.     At all times pertinent hereto, Plaintiff and the members of the Class fully performed and satisfied their obligations under the contract and warranty agreement.

94.     As a proximate result of the aforementioned wrongful conduct and breaches committed by Defendant, Plaintiff and the Class members have suffered and will continue to suffer damages and economic loss in an amount to be proven at trial.  Plaintiff and Class members are entitled to damages and injunctive and declaratory relief as claimed below.

## SECOND CLAIM FOR RELIEF
### (Breach of Express Warranty)

95.     Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

96.     In conjunction with its sale of Shingles, Defendant warranted and promised that it would provide an operational product for a particular warranty period or replace the defective product without consumers having to pay for the labor costs involved.

97.     Defendant placed the Shingles upon the market and, through its advertisements and warranties represented the quality of the Shingles to the public in such a way as to induce reliance upon its representations.

98.     Plaintiff Melissa McCaffrey and the members of the Class did in fact rely on Defendant's representations in purchasing the Shingles.

99.     Plaintiff Melissa McCaffrey and the members of the Class understood that Defendant's promises were part of the basis of the bargain when purchasing Defendant's Shingles.

100.    Defendant breached the express warranties because, as set forth in detail above, it failed to provide customers with a product that would perform the basic intended and essential functions of Shingles for the specified warranty period.

101.    Defendant has received notice of the breaches of warranty alleged herein, by virtue of complaints made by purchasers of its Shingles, as detailed herein.  As detailed in the witness allegations herein, Defendant has received numerous claims, complaints and other notices from its consumers advising Defendant of the defects in its Shingles.

102.    Defendant has failed to provide Plaintiff or the Class, as a warranty replacement, Shingles that conform to the qualities and characteristics that Defendant has expressly warranted are possessed by Defendant's Shingles.

103.    Despite requests to do so, Defendant refuses to adequately repair or replace its Shingles in accordance with the stated warranty terms.  As a result, Plaintiff Melissa McCaffrey and members of the Class whose Shingles had not failed are forced to wait for the substantially certain failure of their Shingles and suffer the accompanying losses associated therewith.

104.    Further, the warranties themselves are unconscionable and unenforceable in that they fail to achieve their specified purpose because they do not provide consumers with an adequate remedy for the failure of Defendant's Shingles.  The warranties do not provide the means for purchasers to repair and replace either the defective product itself, or to remedy structural damage to their homes associated with and caused by these defects.  Applying any warranty limitation to avoid the need to repair the defects set forth herein would be unconscionable in that, *inter alia*, the shingle products contain inherent defects that were already existing at the time of purchase and Defendant knew, or was reckless in not knowing, about the defects, which could not be discovered by Plaintiff and the members of the Class at the time of their purchases lacked any meaningful choice with respect to the warranty terms.

105.    As a direct and proximate result of Defendant's breach of warranty, Plaintiff and the Class members have suffered and will continue to suffer damages and losses in an amount to be proven at trial.

**THIRD CLAIM FOR RELIEF**
**(Breach of Implied Warranty)**

106.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

107.    Defendant designed, developed, tested, manufactured, distributed, marketed, and sold Shingles through authorized dealer-agents for purposes of eventual sale to end users and installation on homes, offices, buildings, and other structures.

108.    Defendant gave specific express warranties directly to its end users as set forth herein.  Defendant also impliedly warranted that its Shingles were properly designed, developed, tested, manufactured, distributed, marketed, and sold and that the designs and materials were proper and of first-class and workmanlike quality.

109.    Defendant knew that the Shingles it designed, manufactured and created would be used by consumers on their homes, offices, buildings, and other structures.

110.    Plaintiff and the members of the Class relied on Maibec's skill and/or judgment to furnish the Shingles for use on their homes, offices, buildings, and other structures, and Defendant knew or should have known that these customers relied on Defendant's special knowledge.

111.    Plaintiff Melissa McCaffrey and the members of the Class relied upon the promises contained within Defendant's warranties and believed that said designs, work, and materials were of first-class workmanlike quality and fit for their intended use and purpose.

112.    Defendant breached said warranty by designing, developing, manufacturing, distributing, marketing, and selling defective Shingles, which were not of first-class workmanlike quality or fit for their intended use.

113.    Defendant provided a defective product and failed to properly inspect, test, and identify defects in the Shingles.

114.    But for Defendant's conduct alleged herein and their breach of implied warranty, Plaintiff and the members of the Class would not have suffered the damages and losses alleged herein.

115.    Defendant has been notified of the defective nature of its Shingles and of its breach of warranty within a reasonable time of its discovery.

116.    As a direct and proximate result of Defendant's breach of implied warranty, Plaintiff and the Class members have suffered and will continue to suffer damages and losses in an amount to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**(Breach of Warranty of Merchantability)**

117.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

118.    Defendant designed, developed, tested, manufactured, distributed, marketed, and sold its Shingles for purposes of its eventual sale to end users and installation on homes, offices, buildings, and other structures.  Plaintiff and the members of the Class relied on the promises contained within Defendant's warranties that the Shingles were free from defects.

119.    The Shingles were not fit for the ordinary purpose for which shingles are intended to be used.

23

120. Defendant expected Plaintiff and the members of the Class to use the Shingles on their properties and such use was reasonably foreseeable. The Shingles sold by Defendant were not merchantable at the time they were sold.

121. Defendant knew and/or should have known that its Shingles were defective and not of acceptable quality as designed and/or that the Shingles were manufactured with substandard and defective materials.

122. Defendant knew and/or should have known that its Shingles were not generally fit for the ordinary purpose for which they were intended to be used as they were designed and manufactured with substandard and defective materials.

123. Defendant knew and/or should have known that its Shingles would reach the end user without substantial change and in the condition in which they were sold.

124. Defendant's Shingles failed in their ordinary and intended use.

125. Defendant has been notified of the defective nature of its Shingles and of its breach of warranty within a reasonable time of its discovery.

126. But for the Defendant's conduct alleged herein and its breach of warranty of merchantability, Plaintiff and the members of the Class would not have suffered the damages and losses alleged herein.

127. As a direct and proximate result of Defendant's breach of warranty of merchantability, Plaintiff and the members of the Class have suffered and will continue to suffer damages and losses in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF
### (Negligence)

128. Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

24

129.    Defendant owed a duty to Plaintiff and the members of the Class to exercise reasonable care in the design, manufacture, quality control and marketing of the Shingles, and to disclose to the consuming public the foreseeable risks associated with the use of its defective Shingles.  Defendant had a further duty not to put defective products such as the Shingles on the market.

130.    Defendant breached its duty by designing, manufacturing, selling, advertising and warranting a defective product, and by failing to take those steps necessary to repair or otherwise discontinue selling a defective product to consumers.

131.    Defendant was aware, or reasonably should have been aware, that the Shingles were defective and did not perform their intended use.

132.    When they purchased Defendant's Shingles, Plaintiff Melissa McCaffrey and the Class were not aware of their defective nature.

133.    As a direct and proximate cause of the foregoing, Plaintiff Melissa McCaffrey and the Class members have suffered and will continue to suffer damages and losses in an amount to be proven at trial.

### SIXTH CLAIM FOR RELIEF
### (Strict Products Liability)

134.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

135.    At all times during the Class period, Defendant was a commercial manufacturer and supplier of the Shingles at issue in this case.

136.    Defendant's Shingles were expected to, and did in fact, reach consumers without substantial change in the condition in which they were supplied.

137.     Defendant's Shingles were and are defectively designed and/or manufactured, and were and are unfit for their intended use.

138.     The Shingles fail to perform in accordance with the reasonable expectations of Plaintiff and the Class and the benefits of the design of the Shingles do not outweigh the risk of their failure.

139.     Defendant has/had a duty and responsibility to disclose to the consuming public the foreseeable risks associated with the use of its Shingles.  Defendant further has/had a duty not to put defective products on the market or to offer a proper substitute.

140.     Defendant breached its duty by failing to disclose the defects that it knew were associated with the Shingles, and by allowing the sale and use of the Shingles when Defendant knew they would not perform as intended.

141.     The defective Shingles caused, among other damages and expense, damage to the underlying structures of the homes where the Shingles were installed, diminished values to affected homes, and costs associated with the repair and/or replacement of defective Shingles.

142.     As a direct and proximate cause of the foregoing, Plaintiff and the Class members have suffered and will continue to suffer damages and losses in an amount to be proven at trial.

### SEVENTH CLAIM FOR RELIEF
### (Unjust Enrichment)

143.     Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

144.     As the intended and expected result of its conscious wrongdoing, Defendant has profited and benefited from the purchase of Shingles by Plaintiff and the Class.

145.     Defendant has voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of Defendant's misconduct, Plaintiff and the Class

were not receiving products of the quality, nature, fitness or value that had been represented by Defendant, and that reasonable consumers expected.

146.    Defendant has been unjustly enriched by its fraudulent and deceptive withholding of benefits to Plaintiff and the Class, at the expense of these parties.

147.    Equity and good conscience militate against permitting Defendant to retain these profits and benefits.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Melissa McCaffrey, prays that this case be certified and maintained as a class action and for judgment to be entered upon Defendant as follows:

1.    For an Order certifying the Class pursuant to Rule 23, appointing Plaintiff as representative of the Class, and appointing the law firms representing Plaintiff as counsel for the Class;

2.    For economic and compensatory damages on behalf of Plaintiff and all members of the Class;

3.    For restitution;

4.    For actual damages sustained or treble damages;

5.    For punitive damages, as otherwise applicable;

6.    For declaratory relief, including but not limited to declarations that:

a.    All of Defendant's Shingles manufactured from 1986 until the present have defects that cause them to fail and leak, resulting in water damage to property and the necessity of the removal and replacement of the Shingles;

b.    All of Defendant's Shingles manufactured from 1986 until the present have a defect in workmanship and material that causes failures; and

c.     Defendant knew of the defects in the Shingles and that the limitations contained in the warranties are unenforceable;

7.     For injunctive relief, including but not limited to an injunction requiring that:

a.     Defendant shall re-audit and reassess all prior warranty claims on its Shingles, including claims previously denied in whole or in part, where the denial was based on warranty or other grounds; and

b.     Defendant shall establish an inspection program and protocol to be communicated to Class members, which will require Defendant to inspect, upon request, a Class member's structure to determine whether a Shingle failure is manifest.

8.     For reasonable attorneys' fees and reimbursement of all costs for the prosecution of this action; and

9.     For such other and further relief as this Court deems just and appropriate.

## JURY TRIAL DEMANDED

Plaintiff, Melissa McCaffrey, demands a trial by jury on all issues so triable.

Date: October 29, 2013

By: ____/s/ Melanie H. Muhlstock_____
Melanie H. Muhlstock
**PARKER WAICHMAN LLP**
6 Harbor Park Drive
Port Washington, NY 11050
Telephone: (516) 466-6500
Facsimile: (516) 466-6665
Email: mmuhlstock@yourlawyer.com

Jordan L. Chaikin
**PARKER WAICHMAN LLP**
3301 Bonita Beach Road, Suite 101
Bonita Springs, Florida 34134
Telephone: (239) 390-1000
Facsimile: (239) 390-0055
Email: jchaikin@yourlawyer.com

28

Charles J. LaDuca
**CUNEO, GILBERT & LADUCA, LLP**
8120 Woodmont Avenue
Suite 810
Bethesda, MD 20814
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
Email: charlesl@cuneolaw.com

Joseph J. DePalma
**LITE DEPALMA GREENBERG, LLC**
Two Gateway Center, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
Email: jdepalma@litedepalma.com

Michael McShane
**AUDET & PARTNERS, LLP**
221 Main Street, Suite 1460
San Francisco, CA 94105
Telephone: (415) 568-2555
Email: mmcshane@audetlaw.com

***Counsel for Plaintiff***